## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FOR MYERS DIVISION

**GREAT LAKES INSURANCE SE**,

    Petitioner,                               **CASE NO.:**

v.

**MING & KWANG DEVELOPMENT
CORPORATION**,

    Respondent.

_____/

## PETITION FOR DECLARATORY RELIEF

Petitioner, Great Lakes Insurance SE ("GLISE"), by and through its undersigned counsel, files this Petition for Declaratory Relief against Respondent, Ming & Kwang Development Corporation ("Respondent"), and alleges as follows:

## PARTIES, JURISDICTION, VENUE

1.    This is an action seeking a declaratory judgment brought pursuant to 28 U.S.C. § 2201 to determine the proper scope and parameters of appraisal concerning a claim for damages exceeding $75,000. More specifically, GLISE seeks a declaration that it is within its rights to request that the appraisal panel, in determining the scope of the subject loss, delineate between replacement cost value and actual cash value damages within its appraisal award form so that GLISE may appropriately pay the award in accordance with the subject insurance policy and Florida law.  In addition, GLISE seeks a declaration that costs

attributed to matching as set forth in Section 626.9744, Fla. Stat., shall not be appraised or awarded given that the policy at issue is a commercial property policy and not a homeowner's policy.

2.    The amount in controversy presented by this *bona fide*, actual, and present dispute exceeds the monetary threshold, and there is complete diversity of citizenship between the parties.

3.    Great Lakes Insurance SE is organized as a Societas Europaea, or "SE," and is a European corporation pursuant to the corporate laws of the European Union.

4.    In determining the citizenship of an SE for federal diversity jurisdiction purposes, the district court in *SNC-Lavalin Constructors Inc. v. Tokio Marine Kiln Insurance Limited, Certain Underwriters at Lloyd's*, Civ. Nos. GJH-19-873 and GJH-19-1510, 2021 WL 2550505 (D. Md. June 21, 2021) found that an SE had all of the features of a U.S. corporation.  *Id.* at *9. Accordingly, the court concluded that an SE should be treated like a U.S. corporation for the purposes of diversity jurisdiction.  *Id.*

5.    Therefore, when determining GLISE's citizenship, it is a citizen of both its state of incorporation and principal place of business for purposes of diversity jurisdiction.  28 U.S.C. § 1332(c)(1).

6.    GLISE's registered office is in Munich, Germany, entered into the commercial register of the local court in Munich under HRB 230378. Furthermore, GLISE' principal place of business is at Königinstrasse 107, 80802

Munich, Germany.

7.    Therefore, GLISE's state of incorporation and principal place of business are both Munich, Germany, and Petitioner is therefore a citizen of Germany.

8.    Pursuant to Respondent's filing with the Florida Department of State, Ming & Kwang Development Corporation is a corporation incorporated in Florida and maintains its principal address at 855 18th Ave. South, Naples, Florida 34102.  *See* Florida Division of Corporations filing, attached as **Exhibit "A**."

9.    A corporation is a citizen of every state in which it is incorporated and of the state in which it has its principal place of business. 28 U.S.C. § 1332(c)(1); *see also Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1346 (11th Cir. 2011) (noting that corporations are "citizens" for diversity purposes wherever they are incorporated and have their principal place of business).

10.    Thus, Respondent is a citizen of Florida.

11.    Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

12.    Venue is proper under 28 U.S.C. § 1391(b)(2), as the property that is the subject matter of this action is situated in Collier County, Florida – within this judicial district.

## FACTUAL BACKGROUND

13.    Respondent purchased a commercial lines policy for the commercial property located at 4584 Enterprise Ave., Naples, Florida 34104 (the "Property"). The policy, bearing number JTA5007032, was in effect from May 15, 2022 to May 15, 2023 (the "Policy").  A copy of the Policy is attached hereto as **Exhibit "B."**

14.    In relevant part, the Policy provides $1,334,918 in building coverage and $180,000 in business income loss coverage.  *Id.*

15.    The Policy covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss" and contains a peril-created opening limitation and exclusions for, *inter alia*, fungus, wet rot, dry rot, wear and tear, rust or other corrosion, decay, deterioration, continuous or repeated seepage or leakage of water, neglect, and faulty, inadequate or defective maintenance.  *Id.* at CP 00 10 10 12, p. 1.

16.    The Policy also includes an appraisal clause, which states:

**2. Appraisal**

If we and you disagree on the value of the property ***or the amount of the loss***, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.   A decision agreed to by any two will be binding.  Each party will:

a.  Pay its chosen appraiser; and

b.  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

*Id.* at p. 10. (emphasis added).

17.    During the Policy period, Respondent filed a Notice of Loss on October 21, 2022, claiming windstorm damage to the Property from Hurricane Ian, with an alleged date of loss of September 28, 2022 (the "Claim").

18.    GLISE promptly acknowledged and adjusted Respondent's Claim.

19.    Specifically, GLISE assigned Adair Horne & Associates (the "TPA") to adjust and administer the loss.

20.    The TPA then assigned an independent adjuster (the "IA") to inspect the Property on behalf of GLISE.

21.    On November 12, 2022, the IA conducted his initial inspection of the Property and found wind damage to both the metal roof and TPO roof coverings.

22.    The IA also observed damage to the exterior metal siding but recommended a reinspection with an engineer, noting that this damage may not be attributable to a covered cause of loss.

23.    Following his initial inspection, the IA prepared an estimate of damages totaling $101,108.36 (RCV), which would amount to a net claim payment to the Insured of $34,362.46, after application of the $66,745.90 deductible (depreciation was not withheld).

24.    A coverage letter and check for $34,362.46 were issued to the Insured on or about March 2, 2023.

25.    On April 12, 2023, the Insured's public adjuster, Stellar Public Adjusting (the "Public Adjuster") submitted an estimate to the TPA totaling $715,690.52 (RCV) and demanded a supplemental payment of $681,328.06.

26.    On May 10, 2023, after receipt of the Public Adjuster's estimate, the IA reinspected the loss and found additional undisputed wind damage.

27.    The IA prepared a supplemental estimate totaling $300,928.37 (RCV), which amounted to a supplemental net claim payment to the Insured of $170,139.20 after application of recoverable depreciation ($29,680.81), the deductible ($66,745.90), and the prior payment ($34,362.46).

28.    A supplemental coverage letter and check for $170,139.20 were issued to the Insured on September 20, 2023.

29.    Thus, GLISE issued payments to the Insured totaling $204,501.66, resulting in an amount in controversy between the parties of approximately $400,000.00.

30.    On September 19, 2023, a professional engineer with Donan Engineering (the "Engineer") inspected the Property to determine the cause and origin of damage to the metal siding.

31.    The Engineer concluded as follows:

    i.  The metal siding was not damaged by wind or wind-borne debris.

    ii.  The dents and impact marks on the lower portions of the metal siding on the east, south, and west-facing elevations of

the building are caused by inadvertent man-made damage from vehicles and/or human activity.

32.    Following receipt of the Engineer's report, on November 29, 2023, the TPA issued correspondence to the Insured, advising that considering the Engineer's findings, no additional covered wind damage was found.  Thus, GLISE denied coverage for the metal siding, casings, downspouts, and trims.

33.    On November 30, 2023, the Public Adjuster sent correspondence to the TPA, demanding "appraisal of the entire loss for all coverages under the policy."  A copy of the Public Adjuster's November 30, 2023 correspondence is attached hereto as **Exhibit "C."**

34.    On December 8, 2023, the TPA sent correspondence to the Public Adjuster, agreeing to proceed with the appraisal, and appointing Kelon Crocker as GLISE's appraiser (the "Carrier's Appraiser").  A copy of the TPA's December 8, 2023 correspondence is attached hereto as **Exhibit "D."**

35.    Within its December 8, 2023 correspondence, the TPA advised that GLISE would "continue to reserve the right to reiterate their denial of coverage for the non-covered portion of the loss."  *Id.*

36.    On January 2, 2024, the Public Adjuster sent further correspondence to the TPA, appointing James Gilleland of Kenedy Claims Adjusting, LLC as the Insured's appraiser (the "Insured's Appraiser").  A copy of the Public Adjuster's January 2, 2024 correspondence is attached hereto as **Exhibit "E."**

37.    On or about January 31, 2024, the Insured's Appraiser and the

Carrier's Appraiser agreed to appoint Justin Pyka of Pyka & Associates Incorporated as the umpire (the "Umpire") for the appraisal.

38.    On or about February 13, 2024, the Carrier's Appraiser sent the Insured's Appraiser and the Umpire a Declaration of Appraiser and Selection of Umpire form (the "Appraisal Form"). The Appraisal Form is attached hereto as **Exhibit "F."**

39.    Under the 'Qualification of Umpire' sub-heading, the Appraisal Form states, in relevant part, as follows:

> *I agree to supply a delineated appraisal valuation (estimate) of replacement cost value and actual cash value that coincides with the award within thirty days from invocation of either member of the panel. I will apply any roof payment schedule if applicable, and will include the amount of the loss of all coverages; unless, otherwise agreed to by a memorandum of appraisal signed by the two principal parties, or agreed to by both appraisers. In preparing my award, I agree to delineate between those damages that were the result of direct physical damages from the covered peril, those damages that are incurred solely on account of matching and continuity, and those indirect damages that are only incurred in connection with making a repair of directly damaged property. Id.*

40.    In other words, the Appraisal Form merely requested delineation between **replacement cost value damages ("RCV")** and **actual cash value damages ("ACV")**, as the replacement cost value of damages necessarily encompasses damages that are incurred solely on account of matching and continuity, as well as indirect damages that are only incurred in connection with making a repair of directly damaged property, whereas the actual cash value of damages solely encompasses those damages that were the result of direct

8

physical damages from a covered peril.

41.    That same day, the Insured's Appraiser responded to the Carrier's

Appraiser and Umpire, stating as follows:

> *I am not in agreement with the language contained within the document given the fact that it speaks to certain items [sic] of which only the principles have authority to address and does not fall within the bounds of the appraisal clause to which we as appraisers are governed by.*
>
> *I'm requesting that you propose an SOU form that simply names the Umpire and speaks to qualifications similar to the following example:*
>
> *I, the undersigned, do hereby accept the appointment of umpire.  As [sic] provided in the forgoing agreement, and solemnly swear that I will act with strict impartiality in all matters of difference that shall be submitted to me in connection with this appointment, and I will make a true, just and conscientious award according to the best of my knowledge, skill and judgment.  I am not related to any of the parties to this memorandum, nor do I have an interest as a creditor or otherwise in said property related to the above referenced matter or the insurance thereon.*

A copy of the Insured's Appraiser's February 13, 2024 correspondence is attached

hereto as **Exhibit "G."**

42.    Notably, on February 14, 2024, the Umpire's assistant electronically

signed the Appraisal Form, but the Umpire advised that he had not reviewed the

form before it was signed.  A copy of the Umpire's February 14, 2024

correspondence is attached hereto as **Exhibit "H."**

43.    On March 27, 2024, the Carrier's Appraiser sent additional

correspondence, reiterating his disagreement with the Appraisal Form and

advising of his intention to request "Umpire involvement in order to expedite the

matter."  A copy of the Insured's Appraiser's March 27, 2024 correspondence is

attached hereto as **Exhibit "I."**

44.     Also on March 27, 2024, GLISE's undersigned counsel emailed the Insured's Appraiser, with a copy to the Umpire, and requested a conference call to discuss the parties' dispute.  A copy of GLISE's undersigned counsel's March 27, 2024 correspondence is attached hereto as **Exhibit "J."**

45.     As a result, the Insured's Appraiser and the undersigned counsel conferred on April 16, 2024 via telephone, but the Insured's Appraiser advised that since he did not have the authority to consent to our request, the undersigned would need to contact the Public Adjuster.

46.     Accordingly, on April 16, 2024, the undersigned contacted the Public Adjuster to request that the Appraisal Form delineate between direct damage, matching costs, and indirect repairs in accordance with Florida law, but after a brief exchange, the Public Adjuster opposed this request.    Notably, the undersigned advised the Public Adjuster that the instant lawsuit would be filed in light of the disagreement as to the Appraisal Form.  A copy of the email exchange between GLISE's undersigned counsel and the Public Adjuster is attached hereto as **Exhibit "K."**

## COUNT I – PETITION FOR DECLARATORY RELIEF

47.     Petitioner re-alleges and re-asserts paragraphs 1-46 as if fully stated herein.

48.     It is well-settled Florida law that "'when the insurer admits that there is a covered loss, but there is a disagreement on the amount of loss, it is for the appraisers to arrive at the amount to be paid.'"  *Johnson v. Nationwide Mut.*

*Ins. Co.*, 828 So. 2d 1021, 1025 (Fla. 2002) (quoting *Gonzalez v. State Farm Fire & Cas. Co.*, 805 So. 2d 814, 816-17 (Fla. 3d DCA 2000)).

49.    Thus, when there has been a demand for appraisal, the Florida Supreme Court "interpret[s] the appraisal clause to require an assessment of the amount of a loss," which "necessarily includes determinations as to the cost of repair or replacement and whether or not the requirement for a repair or replacement was caused by a covered peril or a cause not covered, such as normal wear and tear, dry rot, or various other designated, excluded causes." *State Farm Fire & Cas. Co. v. Licea*, 685 So. 2d 1285, 1288 (Fla. 1996).

50.    In recognition of issues relating to coverage, Florida courts have acknowledged the benefit of a line-item appraisal award, with some courts even requiring such delineation as part of the court's determination of the scope of appraisal prior to its commencement.  *See, e.g.*, *American Cap. Assurance Corp. v. Leeward Bay at Tarpon Bay Condo. Ass'n*, 306 So. 3d 1238 (Fla. 2d DCA 2020) ("the trial court directed the appraiser to 'itemize each category and component of damage appraised, the cause of damage, as well as costs thereof"); *Fla. Ins. Guar. Ass'n v. Olympus Ass'n*, 34 So. 3d 791, 796 n. 1 (Fla. 4th DCA 2010) ("When an appraiser uses a line-item appraisal form, as was done here, 'a court can readily identify any coverage issues that arise during the course of appraisal and resolve these without having to try and decipher what value the appraiser assigned for a particular type of damage.'") (quoting *Bonafonte v. Lexington Ins. Co.*, No. 08-21062-CIV, 2008 WL 2705437, at *2 (S.D. Fla. July 9,

2008).

51.   That said, in setting forth the scope of appraisals, the United States
District Court for the Middle District of Florida has found that "while a line-item
approach may well be of great assistance to the Court and the parties," it cannot
be compelled over objection of one of the parties if the policy's appraisal language
is silent as to the form of the award.   *White Surf Condo. Mgmt. Ass'n, Inc. v.
Lexington Ins. Co.*, No. 6:17-CV-ORL-40TBS, 2017 WL 10084143, *1 (M.D. Fla.
Aug. 10, 2017).

52.   However, following the Order in *White Surf*, the Middle District of
Florida also recognized that "a lump-sum appraisal award presenting nothing
more than a single RCV figure for the entire [Property] would not be appropriate
either," as such an award would not "be stated in terms that coincide with the
contours of the policy." *The Breakwater Commons Ass'n, Inc. v. Empire
Indemnity Ins. Co.*, No. 2:20-cv-31-JLB-NPM, 2021 WL 1214888, at *3 (M.D.
Fla. Mar. 31, 2021) (requiring the appraisal award form to delineate between
"RCV, ACV, ordinance or law, debris removal, and other benefit figures for each
building, and account for the per-building deductibles," where the appraisal
language identically mirrored the appraisal language in the Policy for the instant
claim).

53.   The Florida Supreme Court has defined actual cash value as the
replacement cost less depreciation, stating "actual cash value is generally defined
as 'fair market value' or '[r]eplacement cost minus normal depreciation,' where

depreciation is defined as a 'decline in an asset's value because of use, wear, obsolescence, or age.'" *Trinidad v. Florida Peninsula Insurance Company*, 121 So. 3d 433, 438 (Fla. 2013).

54.    Since *Trinidad*, Florida courts have further refined the definition of actual cash value, holding that actual cash value damages **do not** encompass *undamaged* items, such as matching costs or the costs incurred when making repairs to damaged property. *See Vazquez v. Citizens Prop. Ins. Corp.*, 304 So. 3d 1280 (Fla. 3d DCA 2020) (holding that matching cost damages were not part of the actual cash value of damages to the insured's residence); *Citizens Prop. Ins. Corp. v. Salazar*, 2023 WL 6450467 (Fla. 3d DCA 2023) (holding that the actual cash value of damages to the property did not include matching costs or indirect costs incurred as part of making repairs to physically damaged property).

55.    Moreover, while Section 626.9744, Fla. Stat. contemplates payment of matching costs for claims made under *homeowners' insurance policies*, there is no such similar requirement that matching costs *ever* be awarded under commercial policies such as the instant Policy. *See* Section 626.9744(2), Fla. Stat. ("Unless otherwise provided by the policy, when a *homeowner's insurance policy* provides for the adjustment and settlement of first-party losses based on repair or replacement cost, the following requirements apply: ... When a loss requires replacement of items and the replaced items do not match in quality, color, or size, the insurer shall make reasonable repairs or replacement of items in adjoining areas.")(emphasis added); *see also Ocean View Towers Ass'n Inc. v.*

*QBE Ins. Corp.*, No. 11-60447-Civ. 2011 WL 6754063 (S.D. Fla. Dec. 22, 2011 ("[N]o Florida statute requires the insurer to provide coverage for "matching," except in the case of homeowner's policies . . . Ocean View's policy here is a commercial residential insurance contract, not a homeowner's policy . . . Therefore, the statute does not apply.").

56.    Accordingly, delineation within the appraisal award form between damages that were the result of direct physical damage from a covered peril (i.e., actual cash value) and damages that are incurred solely on account of matching and continuity or in connection with making a repair (i.e., replacement cost value) is appropriate and is, in fact, <u>necessary</u> so that GLISE can pay the appraisal award in accordance with the Policy and Florida law.

57.    Petitioner is therefore within its rights to request that the Umpire delineate between replacement cost value and actual cash value damages within the appraisal award form so that GLISE may appropriately pay the appraisal award in accordance with the Policy and Florida law.

58.    This request for relief presents a present, actual, and justiciable question as to the existence or non-existence of some right, status, immunity, power or privilege, or as to some fact upon which the existence of such right, status, immunity, power or privilege does or may depend, specifically, whether Petitioner, GLISE, is within its rights to request delineation between replacement cost value and actual cash value damages in the appraisal award form.

59.    This request for declaratory relief is not merely advisory, as there is a

bona fide and present dispute between the Parties, with the Insured's Appraiser, acting on behalf of Respondent, having made clear his disagreement with the requested approach and his refusal to sign the Appraisal Form.

60.     Moreover, if this present dispute is not resolved, the Respondent will suffer immediate future harm, as it will be required to proceed to appraisal under uncertain terms, which will likely result in an appraisal award that includes damages that would have otherwise not been owed or would not be owed until repairs have been made.  In other words, without resolution of this dispute, Respondent may be bound to an appraisal award that is inconsistent with its obligations under the Policy and Florida law, causing immediate future harm.

61.     That said, GLISE has no objection to proceeding with the appraisal process while this claim for declaratory relief is resolved, and does so without waiver of any rights, remedies, privileges, and immunities it has under the Policy or applicable law.

**WHEREFORE**, Great Lakes Insurance SE requests that this Honorable Court take jurisdiction over this matter; declare that GLISE is within its rights to request that the appraisal panel delineate between replacement cost value and actual cash value damages within the appraisal award form so that GLISE may appropriately pay the award in accordance with the subject insurance policy and Florida law; and grant GLISE such other further orders, decrees, and remedies as justice may require and may seem just and proper to this Court.

Respectfully submitted May 13, 2024

By:    */s/ David B. Levin*
David B. Levin
Florida Bar No. 26394
dlevin@bakerdonelson.com
Kirstin M. Grice
Florida Bar No. 1011793
kgrice@bakerdonelson.com
**BAKER, DONELSON,
BEARMAN, CALDWELL &
BERKOWITZ, PC**
200 East Broward Boulevard
Suite 2000
Ft. Lauderdale, Florida 33301
Telephone: (954) 768-1600
*Counsel for Petitioner*